# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

KIMBERLY HEREDIA, *as Parent and Next Friend of* AUTUMN ANGELIC PINEDO, *a minor child*, and FRANCISCO RUELAS, *as Personal Representative of the Estate of* JUAN ANGEL PINEDO, *deceased*,

      Plaintiffs,

v.                                                                    Civ. No. 20-565 GBW/CG

CITY OF LAS CRUCES *ex rel.* LAS CRUCES POLICE DEPARTMENT, MANUEL FRIAS, TATE MCBRIDE, NATHAN KRAUSE, and KEEGAN ARBOGAST,

      Defendants.

## **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

THIS MATTER comes before the Court on Defendants' Motion for Qualified Immunity and Summary Judgment on Counts I-VI of Plaintiffs' Second Amended Complaint (*doc. 56*) and Plaintiffs' Motion to Continue the Motion for Summary Judgment to Permit Discovery Pursuant to Rule 56(d) (*doc. 70*).  Having reviewed the Motions and the attendant briefing (*docs. 72, 74, 76*), and being otherwise fully advised regarding relevant case law, the Court DENIES Plaintiffs' Motion and GRANTS Defendants' Motion.

I.  **BACKGROUND**

On September 27, 2018, Juan Angel Pinedo ("Decedent") was shot and killed by officers from the Las Cruces Police Department ("LCPD") following a pursuit on foot that ended on the property of Las Cruces High School ("LCHS").  *Doc. 49* at ¶ 9; *doc. 56* at 2.  On December 17, 2019, Plaintiffs filed this suit in state court, asserting various tort claims and violations of the New Mexico Constitution pursuant to the New Mexico Tort Claims Act ("NMTCA"), NMSA 1978 § 41-4-1 *et seq*.  *Doc. 1-2* at 1–12.  The parties proceeded to exchange discovery over the next several months.  *See id.* at 105–20.  On June 4, 2020, Plaintiffs filed a First Amended Complaint, adding a new claim pursuant to 42 U.S.C. § 1983 and the Fourth Amendment to the United States Constitution.  *Id.* at 121–33.  Based on the new federal claim, Defendants removed the case to this Court on June 10, 2020.  *Doc. 1*.

On August 20, 2020 the Court held a Rule 16 scheduling conference with the parties, establishing deadlines and limitations for discovery.  *Doc. 34*.  During the conference, Plaintiffs' counsel expressed concerns regarding Defendants' intention to move for summary judgment and for a stay of discovery during the pendency of the motion for summary judgment.  *Id.* at 2.  On September 2, 2020, Plaintiffs notified Defendants of their intention to depose the individual Defendants in this case.  *Doc. 74-1*.  On September 14, 2020, Plaintiffs filed a Second Amended Complaint, the operative complaint in this matter.  *Doc. 49*.  On September 15, 2020, the Court held a status

conference with the parties to address some disputes that had arisen in discovery.  *Doc.*

*52*.  Plaintiffs' counsel again expressed concerns regarding Plaintiffs ability to complete

discovery if Defendants moved for a stay of discovery concurrent with a motion for

summary judgment.  *Id.* at 2.

Defendants filed the present Motion on September 23, 2020, seeking summary

judgment on six of Plaintiffs' seven claims.[1]  *Doc. 56*.  Defendants also moved for a stay

of discovery during the pendency of their Motion for Summary Judgment.  *Doc. 58*.  A

stay was granted effective October 6, 2020.  *Doc. 69*.  On October 23, 2020, Plaintiffs filed

a response to Defendants' Motion for Summary Judgment.  *Doc. 72*.  Briefing on

Defendants' Motion was complete with the filing of a reply on November 18, 2020.  *Doc.*

*76*.

On October 20, 2020, Plaintiffs filed their Motion to Continue the Motion for

Summary Judgment to Permit Discovery Pursuant to Rule 56(d).  *Doc. 70*.  Defendants

filed a response to Plaintiffs' Motion on October 26, 2020.  *Doc. 74*.  Briefing on Plaintiffs'

Motion was complete as of November 9, 2020, upon Plaintiffs' failure to file a reply.  *See*

*doc. 75*; D.N.M.LR-Civ. 7.1(b).

---

[1] Defendants do not presently seek summary judgment on Plaintiffs' seventh claim, which alleges a violation of substantive due process pursuant to the Fourteenth Amendment.  *Doc. 56* at 3 n.2.

## II.   LEGAL STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), this Court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the initial burden of showing "that there is an absence of evidence to support the nonmoving party's case."  *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once the movant meets this burden, the non-moving party is required to designate specific facts showing that "there are . . . genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see also Celotex*, 477 U.S. at 324.

Notably, however, summary judgment motions based upon the defense of qualified immunity are reviewed differently from other summary judgment motions.  *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009).  "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established."  *Id*. (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).  This is a "strict two-part test" that must be met before the defendant asserting qualified immunity again "bear[s] the traditional burden of the movant for summary judgment—

showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008) (quoting *Nelson v. McMullen*, 207 F.3d 1202, 1205 (10th Cir. 2000)) (internal quotation marks omitted). The Court may address the two prongs of the test in any order. *Pearson*, 555 U.S. at 236.

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Clark v. Wilson*, 625 F.3d 686, 690 (10th Cir. 2010) (citation omitted). While it is not necessary to identify a case with identical facts, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) and *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). The Supreme Court has repeatedly admonished courts "not to define clearly established law at a high level of generality." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018)). General principles "do not by themselves create clearly established law outside 'an obvious case.'" *White v. Pauly*, 137 S. Ct. 548, 552 (2018) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)). The dispositive question is whether the "right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have

understood that he was violating it." *Kisela*, 138 S. Ct. at 1153 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014)).

In determining whether the plaintiff has met his or her burden to overcome a qualified immunity defense, the Court construes the facts in the light most favorable to the plaintiff as the non-moving party. *See Scott v. Harris*, 550 U.S. 372, 377 (2007). In so doing, the Court must keep in mind three principles. First, the Court's role is not to weigh the evidence, but to assess the threshold issue of whether a genuine issue exists as to material facts requiring a trial. *See Liberty Lobby*, 477 U.S. at 249. "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (internal citation omitted). Second, the Court must resolve all reasonable inferences and doubts in favor of the non-moving party and construe all evidence in the light most favorable to the non-moving party. *See Hunt v. Cromartie*, 526 U.S. 541, 550–54 (1999). Third, the Court cannot decide any issues of credibility. *See Liberty Lobby*, 477 U.S. at 255. "[T]o survive the . . . motion, [the nonmovant] need only present evidence from which a jury might return a verdict in his favor." *Id.* at 257. Nonetheless, at the summary judgment stage, "a plaintiff's version of the facts must find support in the record." *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009).

### III.   PLAINTIFFS' REQUEST FOR ADDITIONAL DISCOVERY

Federal Rule of Civil Procedure 56(d) allows for limited discovery to respond to a motion for summary judgment "when facts are unavailable to the nonmovant."  Fed. R. Civ. P. 56(d).  The "general principle" of Rule 56(d) is that "summary judgment should be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition."  *Price ex rel. Price v. W. Res., Inc.*, 232 F.3d 779, 783 (10th Cir. 2000) (quoting *Liberty Lobby*, 477 U.S. at 250 n.5).  The party seeking additional time "must explain why facts precluding summary judgment cannot be presented."  *Id.* (citation omitted).  "This includes identifying (1) the probable facts not available, (2) why those facts cannot be presented currently, (3) what steps have been taken to obtain these facts, and (4) how additional time will enable the party to obtain those facts and rebut the motion for summary judgment."  *Valley Forge Ins. Co. v. Health Care Mgmt. Partners, Ltd.*, 616 F.3d 1086, 1096 (10th Cir. 2010) (citations and internal quotation marks omitted).  The last requirement is particularly essential, as Rule 56(d) "may not be invoked by the mere assertion that discovery is incomplete or that specific facts necessary to oppose summary judgment are unavailable."  *Jensen v. Redevelopment Agency of Sandy City*, 998 F.2d 1550, 1554 (10th Cir. 1993) (citation omitted).

"Unless dilatory or lacking in merit," motions under Rule 56(d) should generally "be liberally treated."  *Id.* (citation omitted).  In the qualified immunity context, however, this liberal treatment is curtailed "because insubstantial lawsuits 'against

government officials should be resolved *prior to discovery and on summary judgment* if possible.'" *Jones v. City & Cnty. of Denver*, 854 F.2d 1206, 1211 (10th Cir. 1988) (quoting *Creighton*, 483 U.S. at 640 n.2); *see also Harlow v. Fitzgerald*, 457 U.S. 800 (1982).  "Liberal application of [Rule 56(d)] should not be allowed to subvert the goals of *Harlow* and its progeny." *Jones*, 854 F.2d at 1211.  Accordingly, Plaintiffs "must demonstrate *how* discovery will enable them to rebut [Defendants'] showing of objective reasonableness." *Lewis v. City of Ft. Collins*, 903 F.2d 752, 758 (10th Cir. 1990) (citation and internal quotation marks omitted).  Rule 56(d) "is not a license for a fishing expedition, especially when summary judgment is urged based on a claim of qualified immunity." *Id.*  at 759.

Plaintiffs assert that they require additional discovery to address the following items in Defendants' Undisputed Material Facts ("UMFs"[2]):

### 1.  UMFs 5–8: The Second Incident Involving Ms. Heredia

Plaintiffs seek further discovery regarding UMFs 5 through 8 as they pertain to an alleged second incident involving Decedent and his ex-girlfriend, Kimberly Heredia (who brings this suit on behalf of Decedent's child).  *Doc. 70* at 8.  Plaintiffs do not dispute that, on September 21, 2018, Decedent confronted Ms. Heredia and her boyfriend outside Ms. Heredia's home, pointed a pistol at them, and then fired shots

---

[2] All citations to "UMF" or "UMFs" refers to the respective Undisputed Material Fact(s) enumerated in Defendants' Motion for Summary Judgment, *doc. 56* at 3–11.

into the air as he drove away.  UMF 5; *doc. 72* at 2–6.  Plaintiffs do dispute that, on a later

occasion that month,[3] Decedent stood outside Ms. Heredia's home and fired shots.  *See*

UMF 6; *doc. 72* at 3.

In response to Plaintiffs' Motion, Defendants supply a police report describing

the second incident.  *Doc. 74-2* at 6–9.  The police report states that Ms. Heredia reported

hearing gunshots from somewhere behind her home at approximately 2:00 a.m. on

Monday, September 24, 2018.  *Id.* at 7.  On or about September 26, 2018, officers

canvassed the area behind Ms. Heredia's house and retrieved three spent casings.  *Id.*

The recovered casings were found to be the same caliber as a casing recovered from the

September 21 incident.  *Id.* at 8.

Plaintiffs contend that Defendants have not submitted any evidence

"establish[ing] that Decedent was the individual that fired the gun behind Ms.

Heredia's home."  *Doc. 70* at 8.  For purposes of qualified immunity, the relevant

question is not whether Decedent was in fact responsible for the gunshots fired behind

Ms. Heredia's house but whether Defendants reasonably believed that he was.  *See*

*Creighton*, 483 U.S. at 641.  Based on the details recounted above, and the proximity of

the September 21 and September 24 incidents, the Court finds the police report

---

[3] In their Motion for Summary Judgment, Defendants represent that this incident occurred on September 22, 2018.  UMF 6.  However, the evidence supplied in connection with Plaintiffs' 56(d) Motion suggests that the incident in fact occurred in the early hours of September 24, 2018.  *See doc. 74-2* at 6–9.

sufficient to resolve that question in the affirmative.[4]  The Court incorporates this

evidence into the record for purposes of Defendants' Motion for Summary Judgment.

*See* Fed. R. Civ. P. 56(c)(3) (permitting the Court to "consider other materials in the

record" on a motion for summary judgment).  Consequently, further discovery into this

subject is not "essential" under Rule 56(d) and none will be permitted.

2.  UMF 11: Decedent's Social Media Posts

Plaintiffs request additional discovery to respond to UMF 11, which relates to

alleged social media posts by Decedent, in which Decedent stated that "he would not go

back to prison or be taken alive by law enforcement."  *Doc. 70* at 8.  To support UMF 11,

Defendants cite to the affidavit of Defendant Krause in which he attests that he

reviewed such posts.  *Doc. 56-3* at ¶ 10.

The Court finds that there are genuine disputes of fact concerning these social

media posts.  First, Defendants have not presented any direct evidence of the content of

the social media posts.  *See* Fed. R. Evid. 1002, 1003 (requiring an original or a copy of a

writing to prove its content).  Nor have they adequately explained their inability to

present such evidence.[5]  *See* Fed. R. Evid. 1004 (providing that "other evidence" may be

---

[4] The Court further observes that Ms. Heredia, too, believed that Decedent was the responsible party, based on her statements in the police report.  *See doc. 74-2* at 6 (stating that Ms. Heredia had contacted the police to "impart further information" regarding Decedent), *id.* at 7 (reporting Ms. Heredia's statement that "she was afraid for her life with the Friday and Monday incidents").

[5] Defendants suggest that this evidence is or was in Plaintiffs' control.  *Doc. 74* at 7.  However, they do not indicate that Plaintiffs had been "put on notice, by pleadings or otherwise, that the original would be a subject of proof at the trial or hearing."  *See* Fed. R. Evid. 1004(c).

admitted to prove the content of a writing if the original is unavailable through no fault of the proponent).  Second, as Plaintiffs' point out, Defendant Krause's affidavit does not specify when exactly he saw these posts, raising the possibility that he saw them only after the shooting.  *See doc. 72* at 3; *doc. 56* at ¶ 10.  Third, an interview with Defendant Krause taken five days after the shooting casts doubt on what precisely he knew about these posts.  *Doc. 72-1*, Ex. F ("Krause Interview").  When asked about his investigations into Decedent prior to the shooting, Defendant Krause stated:

> What we've done—and there are some other guys in the unit that are a little bit better at it than I am because I'm not real big into the social media anymore—I don't have Facebook or any of that—but uh they—they looked into—and this guy was making—uh Mr. Pinedo was making posts basically saying that he wasn't gonna go back to prison, he had accepted his fate, uh basically just uh kind of that you know I'm not gonna—I'm not gonna get taken alive basically I guess you could say.

*Id.* at 18:40–19:10.  It is unclear from this description if Defendant Krause ever saw these posts directly or was merely informed of their existence by other members of his team.  It is also unclear whether Defendant Krause's description expresses the precise content of these posts or merely a summary of their perceived tone.

For these reasons, the Court finds that the existence of the social media posts and whether they informed Defendants' assessment of the threat posed by Decedent are a subject of genuine dispute.[6]  However, the Court will not order additional discovery

---

[6] In their reply in support of their Motion for Summary Judgment, Defendants assert that Plaintiffs have failed to dispute UMF 11 according to the requirements of Rule 56.  *Doc. 76* at 2.  This assertion appears to be based on a half-correct understanding of Rule 56(c)(1), which Defendants characterize as requiring nonmovants to "cite to portions of the record or show that materials are inadmissible to rebut summary

into this subject, because it does not find the dispute material to Defendants' Motion for Summary Judgment.  For reasons to be explained in detail, the Court finds that Defendants had ample reason to believe that Decedent posed an immediate threat to the safety of themselves and/or others without consideration of the social media posts. Consequently, further discovery into this subject is not "essential" under Rule 56(d) and none will be permitted.

### 3.   UMF 24: Dispatch Report of Shots Fired

Defendants' UMF 24 recounts the recollection of Defendants McBride and Krause of "a dispatch report indicating that [Decedent] had engaged in a confrontation with a bystander resulting in shots fired."  *Doc. 56* at 7.  Plaintiffs dispute that any such dispatch report exists, based on their review of the 595 dispatch recordings produced by Defendants.  *See doc. 70* at 8–9; *doc. 72-1*, Ex. A ("Dispatch Recordings").  Having also reviewed the recordings, the Court finds sufficient evidence to resolve the factual dispute concerning the report of shots fired.

At approximately 5:59 p.m.,[7] multiple 911 calls reported a man running across LCHS property with a firearm in his hand.  Dispatch Recordings (files labeled "2018-09-27_17.59.18_Ch6.wav" and "2018-09-27_17.59.34_Ch4.wav").  One of these callers

---

judgment."  *Id.* at 1.  Defendants have neglected to consider Rule 56(c)(1)(B), which permits a party to dispute a fact by "showing that the materials cited do not establish the absence or presence of a genuine dispute."  Plaintiffs have adequately shown that Defendant Krause's affidavit does not establish the absence of a genuine dispute.

[7] The approximate times have been deduced from the file names.

reported hearing gunshots.  *Id.* (file labeled "2018-09-27_17.59.34_Ch4.wav" at 00:32–00:34).  At approximately 6:01 p.m.,[8] these reports were relayed to officers, including the information that one caller "heard a code 11."  *Id.* (file labeled "2018-09-27_18.01.48_Ch2.wav").  In an interview conducted on October 2, 2018, Defendant McBride discussed receiving the report of sightings at LCHS and recollected a report of "a code 11, or a gunshot."  *Doc. 72-1*, Ex. G ("McBride Interview") at 04:31–04:40.  The report of gunshots was corroborated by Defendant Krause.  Krause Interview at 09:30–09:40.

In summary, there is no genuine dispute regarding whether there was in fact a report of gunshots.  Thus, Plaintiff has not established that further discovery on that matter is required pursuant to Rule 56(d).  However, the record does not conclusively establish a report of a "confrontation with a bystander."  UMF 24.[9]  Nonetheless, for reasons to be explained in detail, the Court finds that Defendants had ample reason to believe that Decedent posed an immediate threat to the safety of themselves and/or others without consideration of an explicit report of such a confrontation.

---

[8] Plaintiffs' counsel attests that only three of the 595 dispatch recordings relate to Decedent being in the vicinity of LCHS.  *Doc. 72-1* at ¶ 5 (citing files labeled "2018-09-27_18.06.47_Ch2", "2018-09-27_18.06.55_Ch2", and "2018-09-27_18.07.20_Ch2").  According to the file names, these reports were made between 6:06 and 6:07 p.m.  When the recordings are heard in chronological order, it becomes clear that these recordings relate to the time that Decedent doubled back to LCHS property *after* running across the LCHS practice fields and through residential yards on Apollo Drive.

[9] Although Defendants were mistaken as to the report of a confrontation, the Court does not find it particularly surprising that their years-later affidavits are less accurate than interviews taken within the week following the shooting.  Moreover, it takes no stretch of the imagination to infer from a 911 call reporting gunshots that a confrontation may have occurred and that any such confrontation would have been with a bystander, as opposed to an officer.

Consequently, further discovery into this subject is not "essential" under Rule 56(d) and none will be permitted.

### 4. <u>UMF 37, 41, 42, 44: Defendants' Commands & Decedent's Compliance</u>

Plaintiffs contend that they require additional discovery to respond to UMFs 37, 41, 42, and 44 insofar as Defendants assert that they commanded Decedent to get away from the gun and Decedent disobeyed by going down to grab the gun. *Doc. 70* at 9. Plaintiffs' position is that Decedent was not attempting to grab the gun but rather attempting to surrender by complying with Defendants' orders to go to the ground. *See generally doc. 72*. Curiously, Plaintiffs' argument here hinges on the available video evidence, which "clearly captures the involved officers telling Decedent to get down on the ground." *Doc. 70* at 9. Plaintiffs' contention that "Defendants' Motion for Summary Judgment conveniently omits that the involved officers commanded Decedent to get down on the ground," *id.*, is certainly relevant to their opposition to summary judgment, but not to the present question of whether additional discovery is required. According to their own arguments, the evidence in the record clearly shows the very fact that Plaintiffs would have the Court consider.

Somewhat more to the point of Rule 56(d), Plaintiffs contend that "the facts regarding which of the officer(s) gave the commands for Decedent to get down on the ground, and whether the shooting officers heard these commands before they fired [are] currently unavailable." *Id.* at 10. Plaintiffs seek to depose the officers to discover these

facts.  *Id.* at 11; *doc. 70-1* at ¶ 5.  The Court has reviewed the video evidence in this case and finds that it clearly demonstrates which of the officers gave the commands and whether the other officers might have heard the commands.  Where events central to the parties' dispute have been captured on video, the Court must view the facts in the light depicted by the video evidence.  *Scott*, 550 U.S. at 379–81.  Accordingly, the Court makes the following findings:

All the commands in this case were given by Defendant Krause and are most clearly audible in his own video.  *Doc. 56-3*, Attach. 1 (file labeled Las_Cruces_High.687.mp4) ("Krause Video").  When Decedent is spotted climbing a fence, Defendant Krause pursues him and shouts,

> He's got a gun!  He's got a gun!  Let me see your hands!  Get your hands up!  Get your hands up!  Get away from the gun!  Get away from the gun! Get on the ground!  Don't—Don't you go down for it, man, I'm gonna shoot your ass.  Don't you go down—Get away from it!  Get away from it! Get away from the gun!  Get away!

*Id.* at 04:38–05:01.  In summary, Defendant Krause ordered Decedent no less than six times to get away from the gun.  He ordered Decedent one time to get down on the ground[10] but immediately amended that order by telling him not to go down for the gun.  After four successive commands to get away from the gun, officers started

---

[10] The reason for the seemingly contradictory orders is unclear.  Defendants posit that the orders may have made sense based on Decedent's shifting position vis-à-vis the gun.  *See doc. 74* at 11.  However, their theory is unsupported by the available evidence because Defendant Krause's lapel camera became detached during his pursuit of Decedent and was pointed at the ground during the relevant time.

shooting.  *Id.* at 05:01–05:04.  By the time the shooting began, no commands to get on the ground had been issued for thirteen seconds.  *Id.* at 04:48–05:01.

Defendant Krause's series of commands is fully audible on Defendant McBride's video.  *Doc. 56-1*, Attach. 1 (file labeled Las_Cruces_High.780.mp4) ("McBride Video") at 25:54–26:15.  When Defendant Krause first shouts, "Get away from the gun," Defendant McBride begins running toward the fence.  *Id.* at 25:58–26:05.  Defendant McBride positions himself in front of the fence as Defendant Krause repeats, "Get away from the gun," a third time.  *Id.* at 26:10–26:15.  Although the view is partially obstructed due to Defendant McBride's position relative to Decedent,[11] Decedent initially appears to be facing away from officers with his hands raised.  *Id.* at 26:13–26:14.  Within the space of one second, as Defendant Krause shouts his final order to "get away," Decedent turns toward the officers and begins to drop his hands and go to the ground.  *Id.* at 26:15–26:16.  Within the next second, the shooting begins.  *Id.* at 26:16–26:19.

Defendant Frias was positioned on a ledge when Decedent was spotted climbing a fence.  *Doc. 56-2*, Attach. 1 (file labeled Las_Cruces_High.779.mp4) ("Frias Video") at 08:20–08:35.  As Defendant Frias approaches the scene, Defendant Krause can be heard shouting "Get away from it!"  *Id.* at 08:48–08:49.  Defendant Krause's command to get

---

[11] Defendant McBride approaches the fence from the left and the weapon in his right hand partially blocks Decedent from view.

down on the ground is not clearly audible on Defendant Frias's video.  *Id.* at 08:35–

08:48.  Defendant Frias arrives at the fence[12] when Defendant Krause shouts, "Get away

from the gun!  Get away!"  *Id.* at 08:50–08:55.  Immediately thereafter, the officers start

shooting.  *Id.* at 08:55–08:58.

Defendant Arbogast's video provides the only completely unobstructed view of

the shooting.  *Doc. 56-4*, Attach. 1 (file labeled "Las_Cruces_High.875.mp4") ("Arbogast

Video"); *id.*, Attach. 2 (file labeled "Las_Cruces_High.875 enhanced.mp4") ("Arbogast

Video Enhanced").  When Defendant Arbogast first arrives at LCHS, Defendant Krause

is faintly audible in the distance yelling, "Get away from the gun!"  Arbogast Video at

00:33–00:38.  Defendant Krause's command to get down on the ground is not clearly

audible on Defendant Frias's video.  *Id.* at 00:36–00:44.  As Defendant Arbogast comes

closer, Defendant Krause can be heard repeating the command to get away from the

gun.  *Id.* at 00:45–00:47.  By the time Defendant Krause repeats the command a third

time, Decedent is in view with his hands up, facing away from the officers on the other

side of the fence.  *Id.* at 00:48–00:49; Arbogast Video Enhanced at 00:19.  In the next

moment, Decedent turns to face the fence and begins bending down to the ground.

Arbogast Video at 00:49–00:50; Arbogast Video Enhanced at 00:19–00:20.  As Decedent's

---

[12] Only the chain-link fence is visible because Defendant Frias's lapel camera was detached and pointed at the ground.

hands drop to the ground, officers start shooting.  Arbogast Video at 00:50–00:53;

Arbogast Video Enhanced at 00:20–00:21.

In summary, Defendant Krause ordered Decedent to get away from the gun

several times, which was audible to all the officers.  Defendant Krause ordered

Decedent once to get on the ground, but this order was not as clearly audible as the

orders to get away from the gun.  These facts, clearly depicted in the video evidence,

adequately address who issued the commands and who heard the commands.

Moreover, it is difficult to imagine that depositions taken more than two years after the

fact will uncover any clearer evidence of what the officers heard than contemporaneous

video evidence.  Plaintiffs have not carried their burden of establishing that additional

discovery on this subject is necessary to respond to Defendants' Motion for Summary

Judgment under Rule 56(d).

5. UMF 48: The Location of the Gun

Plaintiffs seek discovery into UMF 48, which asserts that one of the shots fired by

Defendant Arbogast struck the side of Decedent's gun, causing it to move several feet to

the side.  *Doc. 70* at 10.  Plaintiffs seek to determine, through depositions of the

individual Defendants, "whether the involved officers saw the gun move several feet

during the shooting, or whether the gun was already several feet away from Decedent

when the shooting began."  *Id.*

For a number of reasons, the Court considers it unlikely that deposing the officers will uncover any probable facts concerning the movement of the gun.  First, the officers have never contended that they saw the gun move and, in fact, they contend that they only learned of the movement after discharging their firearms.  *Doc. 56-1* at ¶ 34; *doc. 56-4* at ¶ 15.  Second, the officers' attention was presumably engaged by Decedent himself for the three-second timespan in which the shots were fired.  It is difficult to imagine that depositions would produce any insight into what else Defendants saw in those three seconds over two years ago.  Third, the video evidence shows that the gunfire stirred up the dust around Decedent, obscuring any movement at ground level.  Arbogast Video at 00:50–00:53; *see also* McBride Interview at 09:06–09:18 (describing the dust obscuring his view of Decedent).

As to whether Defendants saw the gun several feet away from Decedent before they began shooting, it has been their consistent position that the gun was in front of Decedent.  From the video evidence, it may be inferred that Defendant Krause perceived Decedent as standing near his gun based on his repeated orders to get away from the gun.  Krause Video at 04:38–05:01.  In the immediate aftermath of the shooting, officers' statements confirm their perception that Decedent was within reach of his gun.  *See* McBride Video at 26:42–26:45 ("The gun's still underneath him but his hands are clear."); Krause Video at 08:10–08:13 ("He didn't get to the gun, man, he was reaching down for it."); Arbogast Video at 07:12–07:13 ("I can't believe he tried going for that gun

again.").   In the days following the shooting, the officers underwent internal interviews, in which they recounted their perception that Decedent was reaching for his gun. McBride Interview at 08:30–08:51 (describing Decedent turning around and reaching for the gun); Krause Interview at 12:28–13:00 (describing Decedent standing "right by" the gun and refusing to distance himself in compliance with commands); *id.* at 13:40–13:46 (describing Decedent reaching for the gun); *see also doc. 72-1*, Ex. E at 08:40–08:48 (interview with Officer Paul Lujan, who was on the scene but did not shoot: "To me, it looked like he was reaching for the gun.").   Finally, in their affidavits submitted in connection with this matter, Defendants attest to their perception that Decedent was reaching for the gun.   *Doc. 56-1* at ¶ 31; *doc. 56-2* at ¶ 25; *doc. 56-3* at ¶ 31; *doc. 56-4* at ¶ 12.

Plaintiffs' request to depose the individual Defendants essentially hinges on the hope that one or all of them will suddenly change their story under the heat of cross-examination.  *See doc. 70* at 11–12.  This hope would make a more compelling argument if there were any indication of inconsistency in Defendants' stories.  *See, e.g., Gilpin v. Clovis Police Dep't*, 2012 WL 13081262, at *16 (D.N.M. Feb. 27, 2012) (unpublished) (rejecting 56(d) request where sworn statements provided by defense were consistent with each other and only basis for further discovery was hope that deponents would impeach themselves); *Trentadue v. CIA*, 2013 WL 12291523, at *1 (D. Utah Sept. 9, 2013) (unpublished) ("Given the importance of this case and the *inconsistencies over time in the*

*Government's representations*, it would serve the public's interest to test the Government's representations by cross examination.") (emphasis added).  Additionally, if the only source of evidence supporting Defendants' version of events were self-serving affidavits, then the need for cross-examination would be clearer.  *See, e.g., May v. Bd. of Comm'rs for Cibola County*, 2014 WL 12796778, at *4 (D.N.M. Mar. 31, 2014) (unpublished).  Defendants' version of events is consistent from their contemporaneous statements on the scene, to their interviews a few days later, to their sworn affidavits a few years later, and with the video evidence of the incident.  Plaintiffs' request for additional discovery on this subject is too speculative to constitute anything more than a fishing expedition.  *See, e.g., Stevenson v. City of Albuquerque*, 446 F. Supp. 3d 806, 877 (D.N.M. 2020) (rejecting 56(d) request where plaintiffs did "not specify probable facts, but only facts that might possibly exist").

More fundamentally, as further explained below, the Court concludes that summary judgment for the Defendants is appropriate even assuming that the firearm was *not* in front of Decedent but "several" feet to the west of him when the officers fired. As a result, further discovery to undermine Defendants' assertion that the firearm was immediately in front of Decedent at the crucial moment is not essential under Rule 56(d).

6. <u>UMF 50: The Position of Decedent's Hands When He Fell</u>

Finally, in UMF 50, Defendants state that Decedent "fell forward with his hands underneath him." *Doc. 56* at 10.  Plaintiffs dispute that Decedent "fell forward," because "Decedent was already in the process of going to the ground." *Doc. 70* at 10; *doc. 72* at 6. On the basis of this asserted dispute, they repeat their request for additional discovery to determine "whether the shooting officers gave and[/]or heard the commands for Decedent to get down on the ground." *Doc. 70* at 10.

There is no real dispute that Decedent was in the process of going to the ground when the shooting began.  This fact is confirmed by the video evidence, and it is consistent with all parties' version of events.  *See* UMF 41.  What is disputed is *why* Decedent went to the ground.  Defendants assert that Decedent was reaching for a gun, while Plaintiffs contend that Decedent was attempting to surrender.  Discovery regarding the position of Decedent's hands will not assist in resolving this factual dispute.  Consequently, further discovery into this subject is not "essential" under Rule 56(d) and none will be permitted.

## IV.   UNDISPUTED MATERIAL FACTS

As detailed above, the Court finds that Plaintiffs have failed to establish that additional discovery is essential under Rule 56(d).  Accordingly, the Court proceeds to consideration of Defendants' Motion for Summary Judgment.  Based on the findings

described above and all available evidence in the record, the Court finds the following material facts to be undisputed[13] for the purposes of this Motion:

1.      On September 21, 2018, Decedent confronted his ex-girlfriend, Ms. Heredia, and her boyfriend in front of Ms. Heredia's home.  UMF 5.  Decedent pointed a pistol at them and then fired shots into the air as he drove away.  *Id.*

2.      Based on the September 21, 2018 incident, an arrest warrant was issued for Decedent.  UMF 1.

3.      On or about September 24, 2018, Ms. Heredia reported hearing gunshots from behind her house at approximately 2:00 a.m. and suspected that Decedent was responsible.  *Doc. 74-2 at 6–12.*  Officers investigating Ms. Heredia's report recovered three 9-millimeter casings (matching a casing recovered from the September 21, 2018 incident) from an area behind Ms. Heredia's home.  *Id.* at 7–8.

4.      On or about September 24, 2018, Detective Rafael Medina requested the assistance of the LCPD's Targeting Neighborhood Threats Unit to apprehend Decedent.  UMF 1.  Defendant McBride is the head of the Targeting Neighborhood Threats Unit.  *Doc. 56-1 at ¶ 4.*

---

[13] Where the Court cites exclusively to one of Defendants' UMFs, it does so pursuant to Rule 56(e)(2), because the UMF in question was not specifically disputed in Plaintiffs' Response.  Where the Court cites to evidence in the record, it does so pursuant to Rule 56(c)(3), which permits consideration of "other materials in the record."

5.      Officers in the LCPD's Street Crimes Unit and Gang Unit also received information to assist with the apprehension of Decedent.  UMF 4.  Defendant Frias is a member of the Street Crimes Unit.  *Doc. 56-2* at ¶ 4.  Defendant Krause is a member of the Gang Unit.  *Doc. 56-3* at ¶ 3.

6.      Defendants McBride, Frias, and Krause received and reviewed information to assist in Decedent's apprehension, including information about the September 21 and 24 incidents.  UMF 3; UMF 5; UMF 7; *doc. 56-1* at ¶¶ 7–8; *doc. 56-2* at ¶¶ 4–6; *doc. 56-3* at ¶¶ 4–5.

7.      Defendants McBride, Frias, and Krause received and reviewed photographs of Decedent in order to identify him.  UMF 9.

8.      Defendants McBride and Krause learned that Decedent had multiple prior convictions for violent felonies.  UMF 10.

9.      Defendant Arbogast, an LCPD officer not in a specialized unit, learned about the arrest warrant against Decedent for the felony charge of aggravated assault involving a firearm.  UMF 13.

10.     In the days following the two incidents involving Ms. Heredia, officers attempted without success to locate Decedent at the residences of his sisters.  UMF 14.

11.     On September 27, 2018, officers received information that Decedent was at the apartment of his girlfriend, Megan Crowley, at 1101 East Boutz Road.  UMF 15.

12.     Several officers including Defendants McBride, Frias, and Krause went to 1101 East Boutz Road, where Ms. Crowley denied that Decedent was present and refused to let them search her apartment.  UMF 16; *doc. 56-1* at ¶ 14.

13.     Defendants McBride, Frias, and Krause left while other officers in unmarked police units stayed to surveil the area.  UMF 17; *doc. 56-1* at ¶ 15.   The surveilling officers reported seeing a subject matching Decedent's description, wearing all black, jump from a second-story window with a pistol in his hand.  UMF 17–18.

14.     Defendants McBride and Frias set up a perimeter at Foster Road and Espina Street while Defendant Krause set up a perimeter at Foster Road and Alamo Street. UMF 20.

15.     Officers received a dispatch report that a subject matching Decedent's description was seen by a ditch near a U-Haul at Montana Avenue and El Paseo Road.  UMF 21.

16.     Defendants McBride and Frias, along with other officers, arrived at the ditch bank and detained a man but quickly identified him as someone other than Decedent. UMF 22; McBride Video at 18:15–19:58; Frias Video at 00:30–2:30.

17.     Defendants McBride, Frias, and Krause next received a dispatch report that Decedent was seen running through the practice fields of LCHS.  UMF 23.

18.     Defendants McBride and Krause also heard a dispatch report that gunshots were heard in the vicinity of LCHS.  Dispatch Recordings (files labeled "2018-09-

27_17.59.34_Ch4.wav" and "2018-09-27_18.01.48_Ch2.wav"); McBride Interview at

04:31–04:40; Krause Interview at 09:30–09:40.

19.      As Defendants McBride and Krause each separately arrived at LCHS, they saw

teams practicing in the fields, and several bystanders provided information regarding

where Decedent went.  UMF 27–29.

20.      Decedent was next spotted near a house on 1815 Apollo Drive.  UMF 32.

21.      During the search in the vicinity of Apollo Drive, Defendant Frias observed

several people coming out of their homes to see what was going on.  UMF 31.

22.      Decedent was next spotted running back in the direction of the LCHS practice

fields, toward a fence on the southern perimeter of LCHS property.  UMF 33–34; *doc. 56-*

*6* at 6.

23.      Decedent climbed the fence as Defendants McBride, Frias, and Krause ran

toward him.  McBride Video at 25:54–26:05; Krause Video at 04:38–05:01; Frias Video at

08:20–08:50.

24.      Defendant Arbogast was on patrol on El Paseo Road when he received the

dispatch reports that Decedent was in the vicinity of LCHS.  UMF 35.  He turned into

the main parking lot of LCHS and began running west toward Decedent's location.  *Id*.

25.      After scaling the fence, Decedent's gun was no longer in his hands.[14]

---

[14] Plaintiffs contend that Decedent dropped his gun intentionally.  *See doc. 72* at 7.  Defendants reply that this fact is unconfirmed by any available evidence.  *Doc. 76* at 3.  The Court is not convinced that this dispute is material.  Even if Defendants were able to perceive that Decedent discarded the gun

26.     Initially, Decedent stood with his back to the fence and his open hands raised. Arbogast Video at 00:48–00:49; Arbogast Video Enhanced at 00:19; *doc. 72-2* at 2, 4.

27.     Defendants Krause, McBride, Frias, and Arbogast all came within several yards of Decedent.  UMF 46.

28.     A black object[15] lay on the ground between Decedent and the fence.  Arbogast Video at 00:48–00:50; Arbogast Video Enhanced at 00:19–00:21.

29.     Defendants Krause, McBride, Frias, and Arbogast perceived this object as a gun. Krause Video at 04:38–05:01; Krause Interview at 12:28–13:00; *doc. 56-1* at ¶ 29; *doc. 56-2* at ¶ 25; *doc. 56-3* at ¶ 28; *doc. 56-4* at ¶ 11.

30.     As Defendant Krause approached the fence, he ordered Decedent twice to raise his hands, twice to get away from the gun, and once to get down on the ground.  Krause Video at 04:41–04:48.

---

voluntarily, it does not follow that Defendants would have recognized that decision as an act of surrender.  For example, Decedent might have decided to discard his gun simply to free his hands as he scaled the fence.

[15] Defendants supply "enhanced" footage from Defendant Arbogast's lapel camera that they contend confirms that the object is the gun.  *See doc. 76* at 2; Arbogast Video Enhanced at 00:19–00:33.  Conversely, Plaintiffs suggest that the black spot is not an object but the shadow of some debris.  *Doc. 72* at 6. Plaintiffs further contend that this debris is visible "in the same location right after the shooting." *Id.* (citing McBride Video at 30:31–31:35; Krause Video at 06:02–06:16; Arbogast Video at 00:50–01:20, 01:38– 01:46; and Arbogast Video Enhanced at 00:19–00:22).

The Court must adopt the version of events depicted on video where it "blatantly contradicts" Plaintiffs' version of events. *Emmett v. Armstrong*, 973 F.3d 1127, 1131 (10th Cir. 2020) (quoting *Scott*, 550 U.S. at 380).  The enhanced video is not so clear as to *blatantly* contradict Plaintiffs' contention that the gun was not in front of Decedent.  However, the Court is no more convinced by Plaintiffs' contention that the black spot was merely the shadow of some debris.  Decedent was in a dirt field, surrounded by debris, none of which caused a shadow similar to that within Decedent's reach as he went to the ground.

31.     Defendant Krause then issued no less than four successive commands to get away from the gun, during which time Decedent did not move from where he stood. Krause Video at 04:48–05:01; Arbogast Video at 00:45–00:50; McBride Video at 26:08–26:14.

32.     Within one second after Defendant Krause's final command to get away from the gun, Decedent turned around to face the fence and began to kneel or crouch, dropping his hands to the ground.  McBride Video at 26:14–26:15; Arbogast Video at 00:48–00:50.

33.     Defendants Krause, McBride, Frias, and Arbogast perceived Decedent as reaching for his gun.  McBride Interview at 08:30–08:51; Krause Interview at 13:40–13:46; Krause Video at 08:10–08:13; McBride Video at 26:42–26:45; Arbogast Video at 04:52–04:54, 07:12–07:13; *doc. 56-1* at ¶¶ 31, 33; *doc. 56-2* at ¶ 29; *doc. 56-3* at ¶¶ 33–34; *doc. 56-4* at ¶¶ 12, 14.

34.     Defendants Krause, McBride, Frias, and Arbogast fired at Decedent, discharging twenty rounds in total, of which eight hit Decedent.  *Doc. 56-6* at 8; *doc. 72-3*.

35.     All shots were fired within three seconds.  UMF 45; Krause Video at 05:01–05:04; McBride Video at 26:16–26:19; Frias Video at 08:55–08:58; Arbogast Video at 00:50–00:53.

36.     Each of the Defendants had arrived on the scene no more than twenty seconds before Decedent began reaching to the ground.  Krause Video at 04:45–05:01; Frias Video at 08:48–08:55; McBride Video at 26:12–26:16; Arbogast Video at 00:48–00:50.

37.     Immediately following the shooting, Defendant Krause requested medical assistance.  UMF 49.  In the meantime, Defendant Arbogast administered emergency medical care to Decedent.  UMF 50; Arbogast Video at 02:00–08:00.

38.     Later the same day, officers from the New Mexico State Police Investigations Bureau arrived to process the scene and reported finding a handgun "several feet west"[16] of Decedent's body.  *Doc. 56-7* at 3.

39.     The officers reported that the handgun had an indentation "consistent with being a bullet graze mark."  *Id*.

V.   **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

   **A.  Defendants' Use of Force Was Constitutionally Reasonable.**

   In *Graham v. Connor*, 490 U.S. 386 (1989), the Supreme Court laid out an objective test for determining whether an officer's use of force constitutes an unreasonable seizure under the Fourth Amendment.  *Id.* at 397.  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.* at 396.  The inquiry must make allowances "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Id.* at 397.  Factors for

---

[16] Plaintiffs indicate throughout their briefing that the gun was approximately nine feet away.  *See, e.g., doc. 72* at 4.  They do not indicate how they arrived at this measurement and the Court's review of the evidence has not uncovered any specific measurement.  *See Several*, Merriam-Webster Dictionary Online (last visited Feb. 5, 2021) ("more than two but fewer than many").

consideration are "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. at 396.  Whether the suspect poses an immediate threat "is undoubtedly the 'most important' and fact intensive factor in determining the objective reasonableness of an officer's use of force." *Pauly v. White*, 874 F.3d 1197, 1216 (10th Cir. 2017) (citation and internal quotation marks omitted).

"A police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).  However, if "there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Id.* at 11–12. Accordingly, deadly force is justified under the Fourth Amendment "if a reasonable officer in Defendants' position would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others." *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995).  When assessing the threat, the Court considers several non-exclusive factors including "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Estate of*

*Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008).  "A reasonable

officer need not await the 'glint of steel' before taking self-protective action."  *Id*.

      The central question in this case is whether Defendants reasonably believed that

Decedent posed an immediate threat of serious physical harm to Defendants or to the

public.[17]  Relevant to the *Larsen* inquiry, the location of the gun is a matter of genuine

dispute.  If the gun was in front of Decedent, then Defendants' use of force was clearly

constitutionally reasonable under *Larsen*.  In that event, Defendant Krause properly

ordered Decedent to get away from the gun, and Decedent's failure to move away

constituted non-compliance.  Moreover, under these circumstances, Decedent's

movement toward the ground would appear to a reasonable officer as an attempt to

retrieve his gun.  This conclusion is especially true where, as here, events are evolving

rapidly and require officers to make "split-second judgments."  *Graham*, 490 U.S. at 397;

*see also Estate of Valverde ex rel. Padilla v. Dodge*, 967 F.3d 1049, 1062 (10th Cir. 2020).

Moving to pick up a recently discarded firearm constitutes a hostile motion because

there is "no reason for [an officer] to have to wait to be shot at or even to see [a suspect]

raise a gun and point it at him before it would be reasonable for him to shoot."  *Phillips*

*v. James*, 422 F.3d 1075, 1084 (10th Cir. 2005); *see also Estate of Valverde*, 967 F.3d at 1062–

---

[17] The Court will not separately address the other two *Graham* factors.  On the first factor, Plaintiffs
concede that the severity of Decedent's crime (i.e., aggravated assault with a deadly weapon) was "high"
and does not weigh in their favor.  *Doc. 72* at 9.  The third factor, whether Decedent was resisting or
evading arrest, implicates the same central factual dispute as the second factor and thus does not require a
separate analysis.

64 (holding that it was reasonable to shoot suspect without waiting to see if he was drawing his gun to toss it away or to shoot the officers).  The distance between Decedent and Defendants was self-evidently close enough for a person holding a firearm to cause lethal harm.[18]  Finally, Decedent's sudden move toward the gun, in defiance of Defendant Krause's repeated orders to get away from the gun, manifests[19] an intention to pick up the gun and either shoot at the officers or continue fleeing through the fields of LCHS where students were practicing.  Applying each *Larsen* factor, if the gun was in front of Decedent, then Defendants were justified in using deadly force.

On a summary judgment, the Court must resolve all factual disputes in the light most favorable to Plaintiffs.  Therefore, the Court assumes that the gun was *not* in front of Decedent but "several" feet to the west of him.  At the same time, on a motion based on qualified immunity, the Court must view the facts from the perspective of the officer on the scene.  *Estate of Valverde*, 967 F.3d at 1062.  The question for purposes of qualified

---

[18] The distance inquiry does not depend on precise measurements but on whether a reasonable officer would believe that a suspect is close enough to cause the officer harm.  *See Zia Trust Co. ex rel. Causey v. Montoya*, 597 F.3d 1150, 1155 (10th Cir. 2010).  The inquiry thus varies depending on the weapon involved. If the suspect is in possession of a knife, then the officer must generally be within "striking distance" of the suspect.  *Tenorio v. Pitzer*, 802 F.3d 1160, 1165 (10th Cir. 2015); *see also Walker v. City of Orem*, 451 F.3d 1139, 1158, 1160 (10th Cir. 2006) (shooting knife-wielding suspect from distance of 20-21 feet was objectively unreasonable); *Zuchel v. Spinharney*, 890 F.2d 273, 275 (10th Cir. 1989) (distance of 10-12 feet from suspect possibly holding a knife casts doubt on reasonableness of shooting).  If the suspect has a gun, however, the zone of danger is considerably wider.  Given that the distance here was close enough for Defendants to cause harm to Decedent with a firearm, the Court considers it beyond reasonable dispute that Decedent was close enough to cause harm to Defendants with a firearm.

[19] Decedent's *actual* intention in going to the ground is unknown.  Plaintiffs contend that Decedent was attempting to surrender.  However, qualified immunity requires viewing the facts through the lens of what a reasonable officer on the scene would know.  *Creighton*, 483 U.S. at 641.  In light of the repeated orders to get away from the gun, moving closer to the gun manifests an intention to use it, not surrender.

immunity, then, is whether Defendants' belief that Decedent was reaching for his gun was reasonable even if mistaken. *See Thomson*, 584 F.3d at 1319 (holding that officers are justified in using more force than necessary if they reasonably but mistakenly believe that a suspect is going to fight back). This inquiry requires considering the totality of the circumstances presented to Defendants. *See id.* at 1319–20.

For purposes of this inquiry, the relevant facts are as follows: (1) Defendants were aware that Decedent had recently threatened Ms. Heredia and another individual with a firearm by pointing it at them and firing it into the air; (2) Defendants had reason to believe that, on a separate occasion, Decedent had recently fired shots outside Ms. Heredia's home; (3) Defendants had pursued Decedent for several days in order to arrest him for aggravated assault with a firearm; (4) when Defendants finally located Decedent, he fled on foot in possession of a firearm; (5) Decedent led Defendants in a chase through residential neighborhoods and across school property, encountering several bystanders along the way; (6) Defendants McBride and Krause were aware of reports of shots fired in the vicinity of LCHS and there was no apparent source other than Decedent; (7) Decedent scaled a fence back onto LCHS property; (8) after scaling the fence, Decedent was no longer holding his gun and had his empty hands raised, but Defendants perceived that his gun was on the ground near him; (9) Decedent was ordered no less than six times to get away from his gun, during which time Decedent

did not move his feet; and (10) in a single continuous motion, Decedent turned around and began going to the ground, dropping his hands.

Considering the totality of the circumstances, Defendants' belief that Decedent was reaching for his gun was reasonable. Their perception followed an extended chase through residential and school property, throughout which Decedent was holding a gun. At least two of the four officers were aware of dispatch reports that shots were fired in the vicinity of LCHS. Decedent only dropped his gun as he scaled a fence. The chase ended with most of the officers separated from Decedent by the fence, hindering the deployment of less deadly methods of seizing Decedent. There was no apparent opening in the fence nearby, thus Defendants would have had to scale the fence to reach Decedent. *Cf. Estate of Larsen*, 511 F.3d at 1263 (finding that suspect's advantageous position on "high ground" further supported officers' perception of a threat). In the time that it would have taken Defendants to scale the fence, Decedent could have picked up the gun and either began shooting at the officers or continued fleeing back across the LCHS practice fields where several bystanders were present. Under the circumstances, Defendants did not need to wait for Decedent to take aim at them before taking protective action, nor did they need to wait for Decedent to continue fleeing and further prolong the chase, with the danger to bystanders ever increasing.

Plaintiffs rely on several specific facts to defeat the objective reasonableness of Defendants' use of force. The Court does not find that these facts adequately

undermine the objective reasonableness of the use of force when considering the totality of the circumstances.  First, Plaintiffs emphasize that Decedent raised his hands in the air "in a universal sign of surrender."  *Doc. 72* at 7.  When analyzing the threat posed by a suspect, the Court must look to the facts as they existed "at the precise moment" force was used.  *Thomas v. Durastanti*, 607 F.3d 655, 664 (10th Cir. 2010).  Although Decedent had his hands raised as Defendants converged on the scene, he, after a few moments, turned toward the officers and began to drop them as he went to the ground.  In that precise moment, it appeared to Defendants that he was reaching for his gun.  The fact that he had his hands raised at one point in time does not render Defendants' later use of force unreasonable.  If anything, the change from a position of apparent surrender to a much different position closer to and more conducive to grabbing the firearm significantly increased the perceived risk posed by Decedent.

Next, Plaintiffs contend that Decedent never pointed his gun at anyone or attempted to injure anyone with it on the day of the shooting.  *See doc. 72* at 10.  It is true that Defendants never *saw* Decedent fire or point his gun at anyone.  However, it is undisputed that Decedent both fired his gun and pointed it at others six days earlier.  It is further undisputed that Decedent was suspected of having fired his gun three days earlier.  Furthermore, the uncontroverted evidence reveals that a 911 caller reported shots fired during the chase, which at least two of the four officers knew.  In light of all this evidence, it is immaterial that Defendants did not personally witness Decedent

firing or pointing his gun.  *See Malone v. Bd. of Cnty. Comm'rs for Cnty. of Dona Ana*, 707 F. App'x 552, 556 (10th Cir. 2017) (unpublished) (rejecting a "per se rule" that a "verbal threat or gesture directed at the officers" is necessary to justify deadly force).  What matters is that the circumstances demonstrated to any reasonable officer that Decedent was ready and willing to use his weapon in a fashion which threatened others.

Additionally, Plaintiffs rely on the medical examiner's report and the fact that several of the wounds sustained by Decedent penetrated through his back.  *See doc. 72* at 8.  Plaintiffs seek to invite comparisons to other cases in which courts have relied on gunshot wounds through the back to deny qualified immunity.  *See, e.g., Estate of Smart ex rel. Smart v. Wichita*, 951 F.3d 1161, 1167 (10th Cir. 2020); *Carr v. Castle*, 337 F.3d 1221, 1225 (10th Cir. 2003); *Baker v. Putnal*, 75 F.3d 190, 198 (5th Cir. 1996).  In those cases, the location and/or trajectory of the gunshot wounds conflicted with officers' version of events.  *Estate of Smart*, 951 F.3d at 1175; *Carr*, 337 F.3d at 1227; *Baker*, 75 F.3d at 198.  In this case, by contrast, the video evidence clearly demonstrates how these wounds were received (as Decedent was bending toward the ground), and the location of the gunshot wounds is consistent with officers' version of events (that Decedent was reaching for his gun).  The location of Decedent's gunshot wounds does not create a factual dispute requiring resolution by a jury.

Finally, Plaintiffs emphasize that not all the officers on the scene fired their weapons.  *See doc. 72* at 7.[20]  The bare fact that an unidentified number of officers may have refrained from firing does not mean that those officers did not perceive Decedent as posing a threat, let alone that it was unreasonable for *any* officer to perceive a threat. If anything, the fact that four officers, each converging on the scene from different vantage points, all perceived the same threat only strengthens the reasonableness of Defendants' actions.  Moreover, the evidence in the record indicates that one officer did not shoot because he was in the process of climbing the fence.  *See doc. 56-2* at ¶ 28; *doc. 72-1*, Ex. E at 08:20–08:30 (interview with Officer Lujan).  The presence of non-shooting officers does not aid Plaintiffs' case.

As a final consideration, the use of deadly force may be unreasonable where "Defendants' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force."  *Sevier*, 60 F.3d at 699 (footnote omitted).  "Mere negligent actions precipitating a confrontation would not, of course, be actionable under § 1983."  *Id.* at n.7; *see also Blossom v. Yarbrough*, 429 F.3d 963, 968 (10th Cir. 2005); *Jiron v. City of Lakewood*, 392 F.3d 410, 415 (10th Cir. 2004).  Plaintiffs argue that Defendants' conduct created the need for the use of force because Defendant Krause's conflicting order to get on the ground created confusion as to whether Decedent should or should

---

[20] In their reply, Defendants dispute that any non-shooting officers were present.  *Doc. 76* at 3–4. However, their own evidence confirms that at least one other officer was on the scene.  *See doc. 56-2* at ¶¶ 27–28.

not go to the ground.  This argument ignores the fact that Defendant Krause's orders to get away from the gun were more frequent and more directly antecedent to Decedent's decision to move to the ground.  Defendant Krause's single order to get on the ground, followed immediately by multiple orders to get away from the gun, was negligent at most.  Thus, it cannot provide the basis to overcome qualified immunity.

The sole material factual dispute in this case concerns the location of the gun at the precise moment Defendants began shooting.  Viewing the facts in the light most favorable to Plaintiffs, the Court assumes that the gun was not within Decedent's reach.  However, viewing the facts from the perspective of a reasonable officer on the scene, a mistaken perception that the gun was within Decedent's reach was not unreasonable under the totality of the circumstances.  Accordingly, Defendants' use of force was not excessive under the Fourth Amendment.

### B.  Plaintiffs Fail to Demonstrate a Clearly Established Constitutional Violation.

Qualified immunity protects officials as long as their actions do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *White*, 137 S. Ct. at 551 (citations and internal quotation marks omitted).  A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks omitted).  "Importantly, the Supreme Court has recently and frequently reminded [lower courts not to] 'define clearly

established law at a high level of generality.'" *Bishop v. Szuba*, 739 F. App'x 941, 944

(10th Cir. 2018) (unpublished) (quoting *al-Kidd*, 563 U.S. at 742). Instead, the "clearly

established" standard requires "a high degree of specificity." *District of Columbia v.*

*Wesby*, 138 S. Ct. 577, 590 (2018) (internal quotation marks omitted).

"[T]he general rules set forth in *Garner* and *Graham* do not by themselves create

clearly established law outside an 'obvious case.'" *Kisela*, 138 S. Ct. at 1153 (citation and

internal quotation marks and omitted). The Court must determine "if courts have

previously ruled that *materially similar conduct* was unconstitutional, or if a general

constitutional rule already identified in the decisional law applies with *obvious clarity* to

the specific conduct at issue." *Estate of Reat v. Rodriguez*, 824 F.3d 960, 964–65 (10th Cir.

2016) (citation omitted). To be clearly established, a legal principle must be "dictated by

controlling authority or a robust consensus of cases of persuasive authority." *Wesby*, 138

S. Ct. at 589–90 (internal quotation marks omitted). In this circuit, the relevant

precedent must come from the Supreme Court, the Tenth Circuit, or from the clearly

established weight of authority from other courts. *Clark v. Wilson*, 625 F.3d 686, 690

(10th Cir. 2010).

Plaintiffs present the constitutional violation at issue in this case as follows:

"[S]hooting an unarmed man, including in the back, while surrendering with his empty

hands in the air and going down to the ground, as he was ordered to do, constituted an

unconstitutional act." *Doc. 72* at 17. Plaintiffs cite several cases both within and outside

the Tenth Circuit to suggest a clearly established constitutional right.  *Id.* at 17–23.  For the reasons previously explained, the Court does not agree with Plaintiffs as to the significance of several facts on which they rely, including the presence of gunshot wounds through the back, Decedent's raised hands, and Defendant Krause's command to go to the ground.  An examination of the cases cited by Plaintiffs only confirms the conclusion that no constitutional violation occurred in this case.

Within the Tenth Circuit, Plaintiffs rely most particularly on *Estate of Smart*, 951 F.3d at 1161; *Fancher v. Barrientos*, 723 F.3d 1191 (10th Cir. 2013); and *Allen v. Muskogee*, 119 F.3d 837 (10th Cir. 1997).  *See doc. 72* at 19–22.  To begin, the events here occurred almost a year and a half before the decision in *Estate of Smart*, in which the Tenth Circuit concluded that the constitutional violations there were not clearly established at the time of the shooting.  951 F.3d at 1172–74.  Consequently, Plaintiffs cannot rely on *Estate of Smart* to assert a clearly established violation as of September 27, 2018.  Furthermore, the facts in *Estate of Smart* are not analogous.  That case involved an active shooter in a crowded public area with multiple conflicting eyewitness reports.  *Id.* at 1166, 1169–71.  Most importantly, there was a genuine factual dispute as to whether the victim was the shooter.  *Id.* at 1171–72.  Here, there is no dispute that Defendants seized the correct person.  The sole material factual dispute is the location of the gun.  A mistaken perception that one man in a crowd is an active shooter is simply not comparable to a

mistaken perception that a man who is wanted for aggravated assault and who fled from police in possession of a firearm is reaching for said firearm.

In *Fancher*, the central issue was whether the district court's segmented analysis of the use of force was proper. 723 F.3d at 1198–1200. The district court had concluded that the defendant did not violate the decedent's constitutional rights by firing the first shot but that factual disputes precluded summary judgment as to the second through seventh shots. *Id.* at 1198. After noting its lack of jurisdiction to review the district court's factual findings, *id.* at 1198–200, the Tenth Circuit affirmed the conclusion that the defendant's second through seventh shots violated clearly established law. *Id.* at 1201. The Tenth Circuit emphasized the district court's findings that the defendant had paused and recognized that he was no longer in danger after firing the first shot. *Id*. Here, all shots were fired within three seconds, and there is no evidence that Defendants recognized that Decedent did not pose a threat to their or the public's safety in the precise moment they fired.

In *Allen*, eyewitness reports differed as to certain material facts of the case. 119 F.3d at 841. Specifically, some of the eyewitnesses reported that officers ran up to the decedent's car and immediately began screaming at him. *Id*. Noting that an officer's conduct leading up to the use of force is relevant if it is "immediately connected" to the use of force, the Tenth Circuit concluded that factual disputes precluded summary

judgment.[21]  *Id.* (citing *Romero v. Bd. of Cnty. Comm'rs of Cnty. of Lake*, 60 F.3d 702, 705 n.5 (10th Cir. 1995)).  The only fault that Plaintiffs identify in Defendants' conduct leading up to the shooting was Defendant Krause's single, and earlier, order to go to the ground.  *Allen* does not clearly establish that an officer violates the Fourth Amendment by shooting a suspect who theoretically could have been complying with an earlier single order to get to the ground but was not apparently complying with several superseding orders to distance himself from a deadly weapon.

*Allen* is further distinguishable.  In *Estate of Valverde v. Dodge*, 967 F.3d 1049, 1067–68 (10th Cir. 2020), the Tenth Circuit observed that the officers in *Allen* "were dealing with an impaired, emotionally distraught person.  In that circumstance officers may be asking for trouble by heightening tensions and fear."  *Id.* at 1068.  Indeed, the most recent cases that have relied on *Allen* have involved an intoxicated and emotionally disturbed individual.  *See Bond v. City of Tahlequah*, 981 F.3d 808 (10th Cir. 2020); *Estate of Ceballos v. Husk*, 919 F.3d 1204 (10th Cir. 2019).  There is no evidence here that Decedent was impaired or emotionally disturbed.  Officers were not called to intervene on a potential mental health crisis;[22] rather, they sought to effect an arrest of an individual who had threatened others with a firearm.  *Cf. Estate of Valverde*, 967 F.3d at 1068 ("The

---

[21] Notably, *Allen* was not a qualified immunity case, thus the applicable standard of review was that of a typical summary judgment motion.  *See Medina v. Cram*, 252 F.3d 1124, 1133 (10th Cir. 2001).

[22] The absence of any apparent mental health crisis also undermines Plaintiffs' reliance on *Walker v. City of Orem*, 451 F.3d 1139 (10th Cir. 2006), and *Zia Trust Co. ex rel. Causey v. Montoya*, 597 F.3d 1150 (10th Cir. 2010).  *See doc. 72* at 18–19; *Walker*, 451 F.3d at 1160; *Zia Trust Co.*, 597 F.3d at 1153.

calculus is very different [from *Allen*] when seeking to apprehend someone believed to be involved in high-violence crimes.").

Plaintiffs also point to several extracircuit police shooting cases, including *Cooper v. Sheehan*, 735 F.3d 153 (4th Cir. 2013); *Baker v. Putnal*, 75 F.3d 190 (5th Cir. 1996); *Bouggess v. Mattingly*, 482 F.3d 886 (6th Cir. 2007); and *Weinmann v. McClone*, 787 F.3d 444 (7th Cir. 2015). *See doc. 72* at 22–23. Precedent from four of ten other circuits is arguably inadequate to establish that the clear weight of authority favors Plaintiffs. More importantly, none of these cases clearly establish a constitutional violation in this case, as they hinge on key facts that distinguish them from the present matter. *Cooper* is particularly instructive on what differentiates these cases, and the Court will address it last.

*Baker* concerned a motion to dismiss on which the district court had improperly adopted the defendant's version of events. 75 F.3d at 197. Treating the district court's dismissal as a grant of summary judgment, the Fifth Circuit found several material factual disputes, including whether the officer saw a pistol in the suspect's hand. *Id.* at 198. Most notably, witnesses reported that the suspect barely had time to see the officer before the officer began shooting, and the coroner's report supported a finding that the suspect was not facing the officer at the time. *Id*. Because there were several factual disputes concerning what the officer knew or reasonably believed about the threat posed by the suspect, the Fifth Circuit reversed. *Id*.

In *Bouggess*, taking the facts in the light most favorable to the plaintiff, the district court found that the defendant did not believe that the decedent was armed.  482 F.3d at 888–89.  Consequently, the defendant did not have probable cause to believe the decedent posed a serious threat, and the use of deadly force was objectively unreasonable.  *Id.* at 890, 892.  Here, Defendants believed, even if mistakenly, that Decedent was reaching for his gun.  *Bouggess* also held that the decedent's crimes (dealing crack and resisting arrest) were not so severe as to merit deadly force and that the defendant's lack of warning was not justified.  *Id.* at 891–92.  Here, Plaintiffs concede that the crime for which Decedent was being pursued was severe, and they do not argue a lack of warning.

The defendant in *Weinmann* was responding to a 911 call from the wife of a man who was threatening to commit suicide.  787 F.3d at 446.  The defendant broke into a locked garage where the man was sitting with a shotgun on his lap.  *Id.* at 446–47.  Shortly after entering the garage, the defendant shot the man four times.  *Id*. at 447.  The defendant admitted that the man never pointed the gun at him but nonetheless contended that he "perceived the weapon as being pointed in his direction."  *Id*.  On the basis of the facts known to the defendant, the Seventh Circuit found no basis to reasonably believe that the man posed an immediate danger to the defendant or anyone other than himself.  *Id.* at 449.

Finally, in *Cooper*, officers responded to a 911 call around 11:00 p.m. regarding a noise disturbance.  735 F.3d at 155.  The officers did not activate their emergency lights or sirens nor did they announce their presence as they approached the plaintiff's home.  *Id*.  In response to one officer tapping on his window, the plaintiff stepped outside his home with a shotgun in his hand pointed to the ground.  *Id*.  "Reacting to the sight of [the plaintiff] and his shotgun, the Officers drew their service weapons and commenced firing without warning."  *Id.* at 156.

In denying qualified immunity, the Fourth Circuit distinguished earlier cases in which "the objective basis for the threat was real, but the gun was not" from the case before it, in which "the shotgun was real, but—taking the facts as the district court viewed them—the threat was not."  *Id.* at 159 (citing *Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001); *McLenagan v. Karnes*, 27 F.3d 1002 (4th Cir. 1994); and *Slattery v. Rizzo*, 939 F.2d 213 (4th Cir. 1991)).  In the earlier cases, the Fourth Circuit had found officers' use of force reasonable because, despite being mistaken that the suspect had a firearm, objective facts nonetheless supported their belief that the suspect was dangerous.  *See Russell*, 247 F.3d at 130 (suspect reaching toward bulge in waistband); *McLenagan*, 27 F.3d at 1005 (suspect running at officer while armed arrestee was on the loose); *Slattery*, 939 F.2d at 215 (suspect ignoring commands to show his hands and clutching object in his fist).  In *Cooper*, on the other hand, the use of force was not reasonable because there was no basis to believe that the plaintiff posed any threat, notwithstanding the mere

presence of a shotgun.  735 F.3d at 159–60.  The situation here is more like *Anderson*, *McLenagan*, and *Slattery* than *Cooper*.  Taking the facts in the light most favorable to Plaintiffs, the gun was not within Decedent's immediate reach, but the objective basis for the threat was nonetheless real based on the totality of circumstances, including Decedent's prior assault against Ms. Heredia and her boyfriend, Decedent's flight in possession of a firearm, the report of shots fired, and Decedent's proximity to school property where bystanders were present.

In summary, the out-of-circuit cases cited by Plaintiffs stand for the principle that officers must believe that a suspect poses an imminent threat of serious physical harm before deploying deadly force and that belief must be reasonable.  This principle is consistent with Tenth Circuit precedent.  *See Estate of Larsen*, 511 F.3d at 1260.  None of these cases clearly establish that officers cannot use deadly force when they believe that a suspect is reaching for his gun, which he only recently discarded, following an extended chase through residential and school property pursuant to an arrest warrant against the suspect for threatening others with his gun.  Because Plaintiffs have not carried their burden of showing a clearly established constitutional violation, their claim of excessive force under the Fourth Amendment fails under both prongs of qualified immunity.

**C. Plaintiffs' State Claims Fail Due to the Objective Reasonableness of Defendants' Use of Force.**

In Counts I through V, Plaintiffs bring claims pursuant to the NMTCA, which provides government agents with immunity from suit outside of certain enumerated causes of action. N.M. Stat. Ann. § 41-4-1 *et seq.* Under § 41-4-12, law enforcement officers' immunity is waived for claims of

> personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties.

N.M. Stat. Ann. § 41-4-12 (subsequently amended 2020).

Plaintiffs' state law claims include unreasonable seizure pursuant to the New Mexico Constitution, battery, negligence, loss of consortium, and wrongful death. *Doc. 49* at ¶¶ 32–67. Defendants argue that Plaintiffs' state law claims are subject to summary judgment on the same basis as the Fourth Amendment claim. *Doc. 56* at 23– 27. Plaintiffs respond that Defendants' use of force was unreasonable and thus all the state claims must be allowed to proceed. *Doc. 72* at 23–24.

### 1. Unreasonable Seizure

The parties agree that *Graham* provides the appropriate standard by which to analyze Plaintiffs' state law excessive force claim, because New Mexico law mirrors federal law in this regard. *Doc. 56* at 22; *doc. 72* at 23. As with federal excessive force

claims, the Court must consider "the circumstances as they appeared to the officer at the time of the shooting." *New Mexico v. Ellis*, 186 P.3d 245, 250 (N.M. 2008) (quoting *Alaniz v. Funk*, 364 P.2d 1033, 1035 (N.M. 1961)). "[O]fficers, within reasonable limits, are the judges of the force necessary to enable them to make arrests or to preserve the peace." *Id.* at 251 (citation omitted). "An officer may use force likely to result in death only in case it appears reasonably necessary to do so to effect an arrest or prevent an escape." *Alaniz*, 364 P.2d at 1034.

In an apparent departure from federal law, New Mexico courts hold that, "generally, the question of the reasonableness of the actions of the officer in using lethal force to apprehend a felon is a question of fact for the jury." *Id.* at 1035. Notably, however, if "the minds of reasonable men could not differ under the circumstances as they appeared to the defendant at the time of the shooting," then the question may be resolved by the Court. *Id.* In *Alaniz*, an officer was pursuing a suspect in the theft of several rifles from a National Guard armory when the suspect began to flee in his car. *Id.* at 1033. Intending to blow out the suspect's tires, the officer shot at the car, striking and killing the suspect. *Id.* The trial court granted a directed verdict in favor of the officer, and the New Mexico Supreme Court affirmed. *Id.* at 1036. Foreshadowing *Graham*'s warning against courts employing 20/20 hindsight, the New Mexico Supreme Court observed:

> That the officers might have placed themselves differently, or formulated a plan that would have been more certain of success without the use of

> firearms, are matters of retrospect which are thought of by judges and
> lawyers after the occurrence; but in the day-by-day work of an officer, it
> can hardly be expected that every arrest or attempted arrest can be
> effected with theoretical perfection.

*Id.* at 1035.

Here, Defendants did not use deadly force merely to effect Decedent's arrest.

The "circumstances as they appeared to [Defendants] at the time of the shooting," *id.*,

were that Decedent was reaching for his gun with the intention either to shoot at

Defendants or to continue fleeing across school property where students were present.

Defendants may have been mistaken concerning Decedent's proximity to the gun, but

this mistake was reasonable under the circumstances for the reasons explained with

respect to Plaintiffs' Fourth Amendment claim.  For the same reasons, Plaintiffs'

excessive force claim under the New Mexico Constitution fails.

>    2. *Battery*

Under the NMTCA, law enforcement officers may be held liable for battery

committed while acting within the scope of their duties.  N.M. Stat. Ann. § 41-4-12.  A

claim for battery against a police officer attempting to effect an arrest is subject to the

same analysis as a claim for excessive force.  *See Park v. Gaitan*, 680 F. App'x 724, 744

(10th Cir. 2017) (unpublished).  An officer may use "necessary force" to effect an arrest

or prevent an escape.  *New Mexico v. Kraul*, 563 P.2d 108, 112 (N.M. Ct. App. 1977).

The force used here was necessary to prevent Decedent from continuing to flee,

in light of the fence separating Defendants from Decedent (which rendered less deadly

methods of apprehending Decedent infeasible), Decedent's proximity to school

property, and the threat Decedent was believed to pose to the officers and the general

public. In short, for essentially the same reasons that Defendants' use of force was not

excessive, Plaintiffs' claim of battery fails.

### 3. *Negligence*

In Count II, Plaintiffs assert various theories of negligence, some of which relate

to the conduct of the individual Defendants and some of which are directed to

Defendant City of Las Cruces. *See doc. 49* at ¶¶ 43–56. Negligence standing alone is not

among the enumerated torts for which immunity is waived under the NMTCA.

*Calliouette v. Hercules, Inc.*, 827 P.2d 1306, 1311 (N.M. Ct. App. 1992). Negligence that

proximately causes an enumerated tort, however, may waive immunity in specific

circumstances. *See, e.g., Schear v. Bd. of Cnty. Comm'rs of Bernalillo Cnty.*, 687 P.2d 728,

730 (N.M. 1984).

Plaintiffs have devoted just one half of one paragraph to opposing summary

judgment on their negligence claim. *Doc. 72* at 23. This paragraph is devoid of citations

to legal authority and merely recapitulates Plaintiffs' arguments for why Defendants'

use of force was unreasonable. Because Plaintiffs' arguments for excessive force fail to

establish the commission of any tort, Plaintiffs' claim for negligence cannot stand.

### 4. *Wrongful Death*

Plaintiffs do not dispute that their wrongful death claim, like all their state law claims, requires a waiver of Defendants' immunity under the NMTCA. *Doc. 72* at 24. The only source of waiver Plaintiffs identify is their rejected claim of excessive force. *Id*. Accordingly, their wrongful death claim must be rejected as well.

### 5. *Loss of Consortium*

Loss of consortium is a derivative claim for damages arising from the plaintiff's relationship to a person who has been physically injured by the tortious conduct of another. *Thompson v. City of Albuquerque*, 386 P.3d 1015, 1017 (N.M. Ct. App. 2016); *Brenneman v. Bd. of Regents of Univ. of N.M.*, 84 P.3d 685, 687 (N.M. Ct. App. 2003). Damages for loss of consortium are recoverable if damages would be recoverable to the injured party for the underlying claim. *Turpie v. Sw. Cardiology Assocs., P.A.*, 955 P.2d 716, 718 (N.M. Ct. App. 1998). To bring a claim for loss of consortium under the NMTCA, the underlying claim must be subject to a waiver. *Thompson*, 386 P.3d at 1018.

Because Plaintiffs have failed to establish that their non-derivative state law claims may proceed, the derivative claim for loss of consortium necessarily fails as well.

## VI. CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiffs' Motion to Continue the Motion for Summary Judgment to Permit Discovery Pursuant to Rule 56(d) and

Affidavit (*doc. 70*) and GRANTS Defendants' Motion for Qualified Immunity and

Summary Judgment on Counts I-VI of Plaintiffs' Second Amended Complaint (*doc. 56*).

IT IS THEREFORE ORDERED that Counts I through VI of Plaintiffs' Second

Amended Complaint (*doc. 49*) are DISMISSED WITH PREJUDICE.

_____

GREGORY B. WORMUTH
UNITED STATES MAGISTRATE JUDGE
**Presiding by Consent**